IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| MIKEL W. RHOADES,<br><br>     Plaintiff,<br><br><br><br>     vs.<br><br><br>MICHAEL J. ASTRUE, Commissioner of<br>Social Security,<br><br>     Defendant. | MEMORANDUM DECISION AND<br>ORDER ON ADMINISTRATIVE<br>APPEAL<br><br><br><br><br><br>Case No. 1:09-CV-75 TS |

This matter comes before the Court on Plaintiff Mikel W. Rhoades' appeal from the

decision of the Social Security Administration denying his application for supplemental security

income.  Having considered the arguments set forth by the parties, reviewed the factual record,

relevant case law, and being otherwise fully informed, the Court will affirm the administrative

ruling, as discussed below.

## I.  STANDARD OF REVIEW

This Court's review of the ALJ's decision is limited to determining whether its findings

are supported by substantial evidence and whether the correct legal standards were applied.[1]

---

[1] *Rutledge v. Apfel*, 230 F.3d 1172, 1174 (10th Cir. 2000).

Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[2]  The ALJ is required to consider all of the evidence, although he or she is not required to discuss all of the evidence.[3]  If supported by substantial evidence, the Commissioner's findings are conclusive and must be affirmed.[4]

The Court should evaluate the record as a whole, including that evidence before the ALJ that detracts from the weight of the ALJ's decision.[5]  However, the reviewing court should not re-weigh the evidence or substitute its judgment for that of the ALJ's.[6]

Plaintiff raises three arguments in his brief: (1) the ALJ erred in failing to properly evaluate the opinions of Plaintiff's treating physician; (2) the ALJ erred by failing to properly evaluate Plaintiff's mental impairments; and (3) the ALJ erred by failing to articulate an RFC that included all of Plaintiff's limitations.

## II.  BACKGROUND

A.   PROCEDURAL HISTORY

Plaintiff filed an application for Supplemental Security Income ("SSI") on October 5, 2006.[7]  Plaintiff's claim was initially denied on March 22, 2007,[8] and upon reconsideration on

---

[2]*Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).

[3]*Id*.

[4]*Richardson v. Perales*, 402 U.S. 389, 402 (1981).

[5]*Shepard v. Apfel*, 184 F.3d 1196, 1199 (10th Cir. 1999).

[6]*Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).

[7]R. 120.

[8]*Id*. at 84.

May 15, 2007.[9]  Plaintiff then requested a hearing before an administrative law judge ("ALJ"),

which was held on June 11, 2008.[10]  The ALJ issued a decision on September 3, 2008, finding

Plaintiff was not disabled.[11]  The Appeals Council denied Plaintiff's request for review on April

17, 2009.[12]  Plaintiff then filed the instant action.

B.      MEDICAL HISTORY

        Plaintiff first noticed back pain around the year 2000.[13]  He attributed the pain to the fact

that he was caring for his mother who suffered from chronic obstructive pulmonary disease

("COPD").[14]  He was told that he had a degenerative back and was treated with medications,

which seemed to help.[15]  Plaintiff's pain seemed to improve after his mother passed away, but he

nevertheless had some residual recurrent symptoms, which resulted in missed work.[16]

        In May 2002, Plaintiff and two co-workers were trying to remove a hydraulic lift from the

back of a truck.[17]  While doing so, Plaintiff felt a "tearing pain" in his back.[18]  Plaintiff finished

---

[9] *Id*. at 85.

[10] *Id*. at 21.

[11] *Id*. at 11-20.

[12] *Id*. at 1-3.

[13] *Id*. at 200.

[14] *Id*.

[15] *Id*.

[16] *Id*.

[17] *Id*.

[18] *Id*.

work that day, but did not work after that until January 2004.[19]  Plaintiff's attempt to return to work lasted about one month, and he has not worked since.[20]

After Plaintiff's injury, he underwent an MRI which showed disc herniation.[21]  Plaintiff received two epidural injections which produced no results.[22]  In August 2003, Plaintiff underwent surgery, but felt worse after surgery.[23]  A postoperative MRI was conducted, which showed no significant change.[24]

Plaintiff was examined by Corey D. Anden, M.D., on October 3, 2005.[25]  Plaintiff represented that he was 50% better after treatment and rates his pain as a 6 on a scale of 1-to-10.[26]  Plaintiff reported his restrictions as no bending, repetitive lifting, and stooping.[27]

On December 20, 2005, Plaintiff was examined by James Taylor, M.D.[28]  Plaintiff complained of pain in the lumbar spine, but had pretty good flexion and extension of lateral rotation and had a normal neurologic exam and negative straight leg raises.[29]  Plaintiff also stated

---

[19]*Id.*

[20]*Id.*

[21]*Id.* at 206.

[22]*Id.*

[23]*Id.*

[24]*Id.*

[25]*Id.* at 257.

[26]*Id.*

[27]*Id.*

[28]*Id.* at 236.

[29]*Id.*

that he was helping his brother with a vending machine business and that he did a lot of climbing and bending with that business.[30]

Plaintiff was seen by Dr. Anden again on July 6, 2006.[31] Plaintiff represented that he was 40% better since treatment and rated his pain as a 7.[32] Plaintiff reported his restrictions as no bending, twisting, or reaching.[33] Dr. Anden noted that Plaintiff had reached maximum medical improvement status and indicated a 13% whole person impairment rating.[34] Dr. Anden noted that Plaintiff had a normal gait and 75% flexion and extension with complaint of low back pain at end ranges.[35] Dr. Anden recorded an impression of chronic low back pain radiating into the right lower extremity, chronic depression/anxiety disorder, and hypertension.[36] Dr. Anden noted that there was no indication for further surgical intervention at the time.[37] Plaintiff was scheduled for a steroid injection and advised to continue medications and exercise.[38] Dr. Anden restricted Plaintiff to full time, light medium level work as available.[39]

---

[30] *Id.*

[31] *Id.* at 255.

[32] *Id.*

[33] *Id.*

[34] *Id.* at 253.

[35] *Id.*

[36] *Id.* at 253-54.

[37] *Id.* at 254.

[38] *Id.*

[39] *Id.*

Dr. Anden administered epidural steroid injections to Plaintiff on July 13, 2006, and August 17, 2006.[40]  On September 7, 2006, Plaintiff reported a 50% improvement and pain at a level 6.[41]  Plaintiff also reported to Dr. Anden that he was getting into a new business with his brother remodeling/rehabilitating houses.[42]  Dr. Anden's treatment plan included patient education, continued medication, possible additional epidural steroid injections, and continued exercise.[43]  Dr. Anden directed Plaintiff to "[p]ursue gainful employment at light medium level with maximal lifting 30 pounds and avoiding repetitive or sustained bending and twisting with heaving lifting or forceful pushing/pulling."[44]  Dr. Anden encouraged Plaintiff to look for light level work again on November 28, 2006.[45]

On January 4, 2006, Plaintiff underwent an independent medical evaluation by Douglas T. Shepherd, M.D., in connection with his claim for worker's compensation benefits.[46]  Dr. Shepherd went through the history of Plaintiff's back injury, as set forth above.[47]  During the evaluation, Plaintiff reported being independent in activities of daily living and housework.[48]

---

[40]*Id.* at 245-51.

[41]*Id.* at 243.

[42]*Id.* at 241.

[43]*Id.* at 242.

[44]*Id.*

[45]*Id.* at 238.

[46]*Id.* at 200.

[47]*Id.*

[48]*Id.* at 201.

Plaintiff also indicated that he helps his brother load vending machines, but that he does not do any heavy lifting.[49]

Upon examining Plaintiff, Dr. Shepherd noted that Plaintiff "demonstrated about 10% to 20% of normal right lateral bending of the lumbar spine, with about 30% of normal lumbar range of motion in all other planes of movement."[50]  Dr. Shepherd noted an impression of "[c]hronic radiculopathy status post remote lumbar microdiskectomy/decompression."[51]  Dr. Shepherd recommended an additional MRI, possible invasive treatment such as epidural steroid injection, medication, and a work conditioning/physical therapy program.

Plaintiff saw Dr. Taylor on February 7, 2006.[52]  Plaintiff indicated that he was "seeing the rehab people for vocational issues as well as Bear River Mental Health."[53]  Dr. Taylor noted that Plaintiff had a lot of low back pain and a very limited range of motion.[54]  Dr. Taylor concluded that Plaintiff was suffering from a number of issues, including chronic low back pain, depression/anxiety/insomnia, and attention deficit.[55]

---

[49]*Id.*

[50]*Id.* at 202.

[51]*Id.*

[52]*Id.* at 236.

[53]*Id.*

[54]*Id.*

[55]*Id.*

Plaintiff saw Dr. Taylor again in March 2006.[56]  At that point, Plaintiff indicated that he had discomfort over the lumbar spine, but appeared to ambulate okay.[57]  In May 2006, Plaintiff had another MRI.[58]  In discussing the MRI, Dr. Taylor noted some postoperative changes at L4-L5 which he felt were not symptomatic.[59]  Dr. Taylor opined that the majority of Plaintiff's disability resulted from his emotional problems and that his back was secondary to the mental health issues.[60]  In August 2006, Plaintiff reported a flare-up after "hiking around" in Yellowstone.[61]

Joel T. Dall, M.D., performed an independent medical evaluation on Plaintiff on October 26, 2006.[62]  Dr. Dall found as follows:

> [Plaintiff] has decreased range of motion which is somewhat subjective and pain-limited.  His right ankle jerk is slightly diminished relative to the left, and he has a positive straight leg raise.  Strength assessment is unreliable and his sensory complaints are subjective.  Nonetheless, the symptom profile and available findings are consistent with ongoing lumbar radiculopathy, either L5 or S1 or both.[63]

---

[56]*Id*. at 229.

[57]*Id*.

[58]*Id*. at 230-31.

[59]*Id*. at 229.

[60]*Id*.

[61]*Id*. at 228.

[62]*Id*. at 205-17.

[63]*Id*. at 215

Dr. Dall found some inconsistencies to suggest possible symptom amplification.[64]  Dr. Dall advised against surgery and recommended physical therapy.[65]  Finally, Dr. Dall concluded that Plaintiff was capable of light-duty work, but cautioned that the role Plaintiff's psychiatric problems may play was uncertain and beyond the scope of his evaluation.[66]

On December 10, 2006, James S. Edelman, Ph.D., Plaintiff's psychologist, submitted a report to Disability Determination Services.[67]  In that report, Dr. Edelman represented that he had been seeing Plaintiff approximately every two weeks since May 20, 2004.[68]  Dr. Edelman reported that Plaintiff was experiencing "chronic stresses/re-exacerbation of loss issues due to chronic pain condition which is complicated by significant learning disabilities."[69]  Dr. Edelman noted an initial assessment of depression and anxiety.[70]  Plaintiff reported a life-long pattern of inattention and forgetfulness, which promoted Dr. Edelman to test for ADHD.[71]  Dr. Edelamn

---

[64]*Id*. at 208.

[65]*Id*. at 216.

[66]*Id*. at 217.

[67]*Id*. at 266-69.

[68]*Id*. at 266.

[69]*Id*.

[70]*Id*.

[71]*Id*. at 266-67.

preformed the Wender test.[72]  Plaintiff's Wender score was 79, where the clinical cut off is 46 or higher.[73]  As a result, Dr. Edelman concluded that Plaintiff suffered from ADHD.[74]

Dr. Edelman further noted: that Plaintiff was fully oriented; his long and short-term memory were intact; there was no signs of organcity; his judgment was good; Plaintiff's focus and concentration varied; Plaintiff's mood was depressed most of the day; his sleep and appetite were impaired; he had daily fatigue and persistent feelings of worthlessness; and had a low frustration tolerance.[75]  Dr. Edelman noted no evidence of psychosis.[76]

Dr. Edelman noted that Plaintiff pushed himself day-to-day to take care of his needed activities.[77]  While his pain/physical condition limited what he could do, Dr. Edelman stated that Plaintiff seemed capable of shopping, transportation, and general self care.[78]  Dr. Edelman diagnosed Plaintiff with major depressive disorder, PTSD in partial remission, ADHD, probable reading disorder and disorder of written expression.[79]

David O. Peterson, M.D., a state agency physician, assessed Plaintiff's physical residual functional capacity in March 2007.[80]  Dr. Peterson concluded that Plaintiff could occasionally lift

---

[72]*Id*. at 267.

[73]*Id*.

[74]*Id*.

[75]*Id*. at 268.

[76]*Id*.

[77]*Id*.

[78]*Id*.

[79]*Id*. at 269.

[80]*Id*. at 270-77.

20 pounds, frequently lift 10 pounds, stand and/or walk for about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and had an unlimited ability to push and/or pull.[81]

In March 2007, Patricia Truhn, a state agency psychological consultant, reported that Plaintiff's mental impairments did not meet or equal a listed impairment.[82]  Ms. Truhn additionally found that Plaintiff had moderate restrictions of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.[83]  Ms. Truhn concluded that, "[f]rom a psychological perspective, [Plaintiff] appears capable of simple work with limited public contact."[84]

Ms. Truhn also completed a mental residual functional capacity assessment in relation to Plaintiff.[85]  In that assessment, Ms. Truhn opined that Plaintiff was not significantly limited in his ability to: understand and remember very short and simple instructions; carry out very short and simple instructions; make simple work-related decisions; ask simple questions or request assistance; accept instructions and respond appropriately to criticisms from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes;

---

[81]*Id*. at 271.

[82]*Id*. at 281-90.

[83]*Id*. at 291.

[84]*Id*. at 293.

[85]*Id*. at 295-98.

maintain socially appropriate behavior and to adhere to basic standards of cleanliness; and be aware of normal hazards and take appropriate precautions. [86]

Ms. Truhn opined that Plaintiff was moderately impaired in his ability to: remember locations and work-like procedures; understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.[87]  Ms. Truhn found no marked limitations in any category.[88]

On May 28, 2008, Dr. Edelman completed a Mental Capacity Assessment.[89]  In that Assessment, Dr. Edelman found that Plaintiff had either moderate or marked limitations in most areas of work-related function.[90]  Dr. Edelman noted extreme limitations in Plaintiff's ability to: accept instructions and respond appropriately to criticism from supervisors and get along with

---

[86]*Id*. at 295-96.

[87]*Id*.

[88]*Id*.

[89]*Id*. at 303-06.

[90]*Id*. at 303-05.

coworkers or peers without distracting them or exhibiting behavioral extremes.[91]  Dr. Edelman noted that Plaintiff's depression was complicated by his back pain.[92]  Dr. Edelman further noted that Plaintiff's frustration tolerance was very low, with market irritability, which he manages largely through isolation.[93]  Dr. Edelman also noted that, because of his injury, Plaintiff could not return to his previous types of employment and that re-training was complicated by Plaintiff's learning disabilities.[94]

Dr. Edelman wrote a letter to Plaintiff's counsel on June 25, 2008.[95]  In that letter, Dr. Edelman states that Plaintiff has generally engaged in labor-type positions.[96]  However, because of his injury, Plaintiff has been unable to continue this type of work and his learning disabilities, coupled with his ADHD, have prevented him from benefitting from re-training possibilities.[97]  As a result of these things, Dr. Edelman explains, Plaintiff has found himself without employment which has led to "financial hardship, dependency upon others, generally increased life and interpersonal stresses, as well as serious injury to self esteem/self concept.  These losses precipitated a serious depression, which has not since evidenced remission."[98]

---

[91]*Id.* at 304.

[92]*Id.*

[93]*Id.*

[94]*Id.* at 305.

[95]*Id.* at 307.

[96]*Id.*

[97]*Id.*

[98]*Id.*

On July 17, 2008, Margaret Moore, Ph.D., completed a Psychiatric Review Technique Form concerning Plaintiff at the request of the ALJ.[99]  Dr. Moore found that Plaintiff's mental impairments did not meet or equal a listed impairment.[100]  Dr. Moore found that Plaintiff's mental impairments resulted in: mild to moderate restrictions of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no extended episodes of decompensation.[101]

C.      HEARING TESTIMONY

At the hearing, the ALJ heard testimony from Plaintiff, a vocational expert, and a medical expert.  Plaintiff testified that he had tried to return to his previous job in December 2003, but was unable to because of the pain, and because of the twisting, bending, and lifting involved.[102]  Plaintiff testified that he had been working with vocational rehabilitation, which sent him to school, but he was unable to complete it because he could not pay attention and needed one-on-one instruction.[103]  He testified that he does not read unless he has to and that he has to read things two or three times before he understands them.[104]  Plaintiff testified that he could not perform a job involving taking tickets from people at a movie theater because he does not like

---

[99]*Id*. at 309-22.

[100]*Id*. at 310-18.

[101]*Id*. at 319.

[102]*Id*. at 32-33.

[103]*Id*. at 34.

[104]*Id*. at 38.

being around people.[105]  Plaintiff also testified that he could not perform a job of sorting clothes because he could not maintain his concentration.[106]

Plaintiff testified that when he is depressed he spends the day lying down and does not want to be around other people.[107]  While at home, Plaintiff described feeling "like a tiger in a cage, somebody wanting to get out."[108]  Plaintiff stated that, on average, there are between one and two days per week where he does not leave his home.[109]  Plaintiff stated that he usually only goes out to attend doctors' appointments.[110]

Plaintiff also testified about his leg and back, stating that he has constant pain in his lower back and right leg.[111]  Plaintiff stated that he could sit for 30 to 45 minutes at any one time.[112]  Plaintiff also stated that he could walk for about a block-and-a-half before needing to sit down.[113]  Plaintiff testified that he avoids lifting and bending, but could lift a sack of groceries or a gallon of milk in each hand.[114]  Plaintiff testified that the thing that prevents him from working was his

---

[105]*Id.* at 39-40.

[106]*Id.* at 40.

[107]*Id.* at 41.

[108]*Id.* at 43.

[109]*Id.* at 44.

[110]*Id.* at 43.

[111]*Id.* at 46-47.

[112]*Id.* at 48-49.

[113]*Id.* at 49.

[114]*Id.*

lack of experience[115] and his depression.[116]  Plaintiff testified that he did not ever see himself

returning to work.[117]

    The vocational expert testified that Plaintiff's past relevant work included: heavy semi-

skilled work as a mechanic helper; medium unskilled work as a warehouse worker; and light to

medium and unskilled to low semi-skilled work as a janitor, bartender, and prep cook.[118]  The

ALJ presented the vocational expert with a hypothetical of a person of Plaintiff's age, education,

and work experience, with the following residual functional capacity: sit continuously for three

hours; stand continuously for one hour; sit for six hours of an eight-hour period; stand for four

hours of an eight-hour period; lift 12 pounds occasionally; lift ten pounds frequently; walk, climb

stairs, squat, bend and stoop, kneel, use foot controls, and drive a vehicle occasionally;

continuously balance; reach above the shoulders, push and pull, turn arms and wrists, open and

close fists, and use hands and fingers frequently.[119]  The ALJ asked the vocational expert to

assume the following mental limitations: mild-to-moderate limitations in concentration,

following detailed instructions, performing duties within a schedule, and dealing with work

instructions; mild limitations in memory, understanding, exercising judgment, remembering

procedures, sustaining a routine without supervision, relating to others, and getting along with

co-workers; no limitations in following simple instructions; not significantly limited in the

---

[115]*Id*. at 50.

[116]*Id*. at 53.

[117]*Id*. at 54.

[118]*Id*. at 60-61.

[119]*Id*. at 62-63.

general areas of understanding and memory and adaptation; and not significantly limited to moderately limited in the general areas of concentration and persistence and social interaction.[120] The vocational expert testified that such a person could not perform any of Plaintiff's past jobs, but could perform a number of unskilled sedentary jobs.[121]

The ALJ also heard testimony from a medical expert. The medical expert testified that, in her opinion, Plaintiff had not undergone a thorough psychological evaluation.[122] Rather, the records were summary statements, many of them based on Plaintiff's report.[123] The medical expert noted that there were references to anxiety and depression throughout the records, but that there was insufficient information, such as progress notes, to help interpret those diagnoses.[124]

D.    THE ALJ'S DECISION

The ALJ followed the five-step sequential evaluation process in deciding Plaintiff's claims. At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since October 5, 2006, the application date.[125] At step two, the ALJ found that Plaintiff suffered from the following severe impairments: a failed back syndrome following low back surgery in September 2003 and an affective disorder.[126] At step three, he found that Plaintiff did

---

[120]*Id*. at 63-64.

[121]*Id*. at 64-66.

[122]*Id*. at 73.

[123]*Id*. at 74.

[124]*Id*. at 74-76.

[125]*Id*. at 13.

[126]*Id*.

not have an impairment or combination of impairments that met or equaled a listed

impairment.[127]  The ALJ then found that Plaintiff had the residual functional capacity:

> to perform sedentary work . . . except claimant can sit for three hours at one time
> and for six hours in an eight-hour workday, stand for one hour at a time and for
> four hours in an eight-hour workday; lift and carry 12 pounds occasionally and ten
> pounds frequently; occasionally kneel, drive an automobile and use foot controls
> to push and pull.  Claimant is moderately limited in his capacity to interact
> appropriately with the general public and to deal with stress in the competitive
> workforce.  He is mildly to moderately limited in his capacity to sustain
> concentration and attention for extended periods, to perform duties within a
> schedule and maintain regular attendance, and be punctual within customary
> tolerances.  He is mildly limited in his ability to understand and remember
> detailed instructions, to make common sensical decisions, to remember locations
> and work-like procedures, to sustain an ordinary routine without special
> supervision and to get along with coworkers or peers without distracting them or
> exhibiting behavioral extremes.[128]

At step four, the ALJ found that Plaintiff was unable to perform any of his past relevant work.[129]

At step five, the ALJ found that there were jobs that exist in significant numbers in the national

economy that Plaintiff could perform.[130]  Therefore, the ALJ found that Plaintiff was not

disabled.[131]

### III.  DISCUSSION

Plaintiff raises three arguments in his brief: (1) the ALJ erred in failing to properly

evaluate the opinions of Plaintiff's treating physician; (2) the ALJ erred by failing to properly

---

[127]*Id*. at 14.

[128]*Id*. at 15.

[129]*Id*. at 18-19.

[130]*Id*. at 19-20.

[131]*Id*. at 20.

evaluate Plaintiff's mental impairments; and (3) the ALJ erred by failing to articulate an RFC

that included all of Plaintiff's limitations.  The Court will address each argument in turn.

A.      TREATING PHYSICIAN

Plaintiff argues that the ALJ erred in failing to properly evaluate the opinions of his

treating physician.  Specifically, Plaintiff argues that the ALJ erred in his treatment of the

opinions of Dr. Edelman.

The ALJ gave "very little" weight to Dr. Edelman's mental capacity assessment and gave

no wieght to his conclusion that Plaintiff could not work at his past relevant jobs.[132]  However,

the ALJ accepted "the opinions of Dr. Edelman with regard to the medical issues relating to the

nature and severity of [Plaintiff's] impairments."[133]  The ALJ noted that "the opinions as to

[Plaintiff's] residual functional capacity, the ability to do past work, the ability to do other work

and whether there is a disability under the Social Security Act are on issues reserved to the

Commissioner."[134]  The ALJ gave "diminished weight" to Dr. Edelman's opinion on those issues

"as they indicate very extreme limitations that are unsupported by the objective evidence,

inconsistent with [Plaintiff's] testimony at the hearing and inconsistent with [Plaintiff's]

activities of daily living as demonstrated in the record."[135]  Similarly, the ALJ gave "little

---

[132]*Id*. at 17.

[133]*Id*. at 18.

[134]*Id*.

[135]*Id*.

weight" to Dr. Edelman's June 25, 2008 letter because it was "based on very little empirical evidence and again invade[d] the ultimate question."[136]

The ALJ, in reviewing the opinions of treating sources, must engage in a sequential analysis.[137]  First, the ALJ must consider whether the opinion is well-supported by medically acceptable clinical and laboratory techniques.[138]  If the ALJ finds that the opinion is well-supported, then he must confirm that the opinion is consistent with other substantial evidence in the record.[139]  If these conditions are not met, the treating physician's opinion is not entitled to controlling weight.[140]

This does not end the analysis, however.  Even if a physician's opinion is not entitled to controlling weight, that opinion must still be evaluated using certain factors.[141]  Those factors include:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.[142]

---

[136]*Id.*

[137]*Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).

[138]*Id.*

[139]*Id.*

[140]*Id.*

[141]*Id.*

[142]*Id.* at 1301 (quoting *Drapeau v. Massanri*, 255 F.3d 1211, 1213 (10th Cir. 2001)).

After considering these factors, the ALJ must give good reasons for the weight he ultimately assigns the opinion.[143]  If the ALJ rejects the opinion completely, he must give specific, legitimate reasons for doing so.[144]

The Court finds that the ALJ properly analyzed the opinions of Dr. Edelman.  First, the ALJ found that Dr. Edelman's opinion was not well-supported by medically acceptable clinical and laboratory techniques.  The ALJ specifically noted that lack of treatment notes to support Dr. Edelman's position.[145]  The record was left open for Plaintiff to supply these treatment notes,[146] but they were apparently never submitted.  The ALJ further noted a lack of empirical evidence, stating that there was "no Wechsler Adult Intelligence Scale-III or Minnesota Muliphasic Personality Inventory-2 data to support Dr. Edelman's conclusions."[147]  Indeed the only testing that was apparently conducted is evidence by Plaintiff's Wender Score.  The Court finds that there is substantial evidence to support the ALJ's finding that Dr. Edelman's opinions were not well-supported by medically acceptable clinical and laboratory techniques.

Second, the ALJ found that Dr. Edelman's opinions were inconsistent with the other evidence in the record.  Specifically, the ALJ pointed to Plaintiff's activities of daily living.  Plaintiff takes issue with the fact that the ALJ failed to cite any portion of the record that indicates that Plaintiff's activities of daily living contradict Dr. Edelman's opinions.  While the

---

[143]*Id.*

[144]*Id.*

[145]R. 18.

[146]*Id.* at 77-82.

[147]*Id.* at 18.

Court is similarly troubled, the record contains a number of references to Plaintiff's activities of daily living which contradict Dr. Edelman's opinion of extreme limitations.[148]  Further, the other doctors who treated Plaintiff did not find that he was precluded from working.  Dr. Dall concluded that Plaintiff was capable of performing light-duty work.[149]  Dr. Anden encouraged Plaintiff to pursue gainful employment.[150]  Ms. Truhn found that, from a psychological perspective, Plaintiff appeared capable of simple work with limited public contact.[151]  Based on these things, the Court finds that there is substantial evidence to support the ALJ's conclusion that Dr. Edelman's opinions were inconsistent with the record.

Finally, the ALJ properly rejected those opinions of Dr. Edelman which encroached on the Commissioner's duty.  Those types of opinions are reserved to the Commissioner.[152]

Based on the above, the Court finds that there was substantial evidence to support the ALJ's decision that Dr. Edelman's opinions were not entitled to controlling weight and that the ALJ gave those opinions the appropriate amount of weight.

---

[148]*See id*. at 86 (noting that Plaintiff can do all his self-care and hygiene needs, prepares meals, does laundry, drives a car, uses public transportation, shops in stores for food, watches television, walks around the block); *id*. at 156-64 (stating that Plaintiff watches television, visits neighbors, prepares own meals, cleans his trailer, does laundry, can drive a car, shops for clothes, food, and medication, and goes to medical appointments); *id*. at 166 (stating that Plaintiff is able to tend to his own personal care); *id*. at 201 (noting that he helps brother load vending machines); *id*. at 228 (indicating that Plaintiff went hiking); *id*. at 241 (stating that Plaintiff was going into a new business with his brother remodeling/rehabilitating houses).

[149]*Id*. at 217.

[150]*Id*. at 238, 242.

[151]*Id*. at 293.

[152]*See* 20 C.F.R. § 404.1527(e).

B.      MENTAL IMPAIRMENTS

Plaintiff next argues that the ALJ erred by failing to evaluate his mental impairments as required by 20 C.F.R. § 416.920a.  Pursuant to 20 C.F.R. § 416.920a(c)(3), the ALJ considers four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.  When ranking the first three functional areas, the ALJ is to use a five-point scale: none, mild, moderate, marked, and extreme.[153]  When ranking episodes of decompensation, the ALJ is to use a four point scale: none, one or two, three, four or more.[154]  20 C.F.R. § 416.920a(e)(2) states that the ALJ's decision "must include a specific finding of limitation in each of the functional areas described in paragraph (c) of this section."[155]

In determining whether Plaintiff's mental impairment met or equal a listed impairment, the ALJ made the following statement:

> The claimant's mental impairment does not meet or medically equal the criteria of listing 12.04.  In making this finding the undersigned has considered whether the "paragraph B" criteria are satisfied.  To satisfy the "paragraph B" criteria, the mental impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  A marked limitation means more than moderate, but less than extreme.  Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.
>
> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of the mental

---

[153]*Id*. § 416.920a(c)(4).

[154]*Id*.

[155]*Id*. § 416.920a(e)(2).

impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph b" mental function analysis.[156]

The ALJ's full residual functional capacity assessment is set forth above.  Of relevance here are the following findings by the ALJ: moderate limitations in Plaintiff's capacity to interact appropriately with the general public and to deal with stress in the competitive workforce; mild to moderate limitations in Plaintiff's capacity to sustain concentration and attention for extended periods;  mild to moderate limitations in Plaintiff's capacity to perform duties within a schedule and maintain regular attendance; and  mild to moderate limitations in Plaintiff's capacity to be punctual within customary tolerances.[157]

Plaintiff argues that this does not meet the requirements of the regulation.  Plaintiff asserts that while the residual functional capacity assessment may have rated the areas of social functioning and concentration, persistence, and pace, it does not give a clear rating to Plaintiff's limitations in activities of daily living nor does it make any findings related to episodes of decompensation.  The Commissioner argues that any error was harmless.

The Court agrees that an error has occurred.[158]  The ALJ did not properly follow the special technique set out in the regulations.  The question is whether that error is harmless, as argued by the Commissioner.

---

[156]R. at 14.

[157]*Id*. at 15.

[158]*See Stokes v. Astrue*, 274 Fed.Appx. 675, 679 (10th Cir. 2008).

The Tenth Circuit addressed this issue in *Fischer-Ross v. Barnhart*.[159]  There the court addressed whether *Clifton v. Chater*[160] "required reversal where the ALJ's factually substantiated findings at steps four and five of the evaluation process alleviates *any* concern that a claimant might have been adjudged disabled at step three."[161]  The court held that it did not.[162]  The court noted that the harmless error analysis should be used cautiously in administrative review settings, but held it "'nevertheless may be appropriate to supply a missing dispositive finding . . . where, based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.'"[163]

The Tenth Circuit addressed the precise question before the Court in *Stokes v. Astrue*. There, as here, the ALJ failed to utilize the "special technique" required by the regulations at step three.[164]  In that case, the ALJ "simply stated that he had 'carefully compared [Ms. Stokes'] signs, symptoms, and laboratory findings with the criteria specified in all of the Listings of Impairments' and found that her impairments did not meet the criteria for any listed

---

[159]431 F.3d 729 (10th Cir. 2005).

[160]79 F.3d 1007, 1009 (10th Cir. 1996) (holding that a conclusory determination at step three was beyond meaningful judicial review).

[161]*Fischer-Ross*, 431 F.3d at 730.

[162]*Id.*

[163]*Id.* at 733-34 (quoting *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004)).

[164]274 Fed. Appx. at 679.

impairment."[165]  The court found this to be deficient under the regulations.[166]  However, the court found the error to be harmless.

In that case, the plaintiff had been diagnosed with anxiety, a depressive disorder, and a pain disorder associated with both psychological factors and a general medical condition.[167]  At step three, those impairments were compared with impairments listed at sections 12.04, 12.06, and 12.07.[168]  In the case before the Court, Plaintiff's impairments were compared to section 12.04.[169]  In both cases, in order for the ALJ to find that the mental limitations met the required level of severity, the ALJ would have to find that the limitations resulted in at least two of the following: (1) marked restrictions of activities of daily living; or (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (3) repeated episodes of decompensation, each of extended duration.[170]  In *Stokes*, the court found that, an administrative factfinder could have determined that Ms. Stokes had marked difficulties in maintaining concentration, persistence, or pace, but could not find that she had marked restrictions of activities of daily living, marked difficulties in maintaining social

---

[165]*Id.*

[166]*Id.*

[167]*Id.* at 680.

[168]*Id.*

[169]R. at 14.

[170]274 Fed.Appx. at 680.

functioning, or repeated episodes of decompensation, each of extended duration.[171]  Therefore, the failure of the ALJ to use the proper technique at step three was harmless error.[172]

Here, Plaintiff concedes that the ALJ made sufficient findings concerning Plaintiff's limitations as to social functioning and concentration, persistence, and pace, neither of which were deemed to be marked or extreme.  Thus, in order for a non-harmless error to have occurred, the Court must find that an administrative factfinder could find that Plaintiff had marked restrictions in his activities of daily living *and* had repeated episodes of decompensation, each of extended duration.

Turning to episodes of decompensation: "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."[173]  "The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks."[174]

Here, Dr. Edelman did not rate this category.  The only individuals to assess this category—Ms. Truhn and Dr. Moore—rated episodes of decompensation, each of extended duration as "none."[175]  Similarly, the other materials in the record do not support a finding of

---

[171]*Id*. at 681-82.

[172]*Id*. at 682.

[173]Listed Impairments § 12.00(C)(4).

[174]*Id*.

[175]R. at 291, 319.

repeated episodes of decompensation, each of extended duration.  Thus, there is no evidence

from which an administrative factfinder could find repeated episodes of decompensation.

Therefore, even if Plaintiff had marked restrictions in his activities of daily living, he would still

not meet or equal listing 12.04.  While the Court does not condone the ALJ's failure to follow

the specific technique at step three required by the regulations, the Court finds that error to be

harmless.

C.      RESIDUAL FUNCTIONAL CAPACITY

        Finally, Plaintiff argues that the ALJ failed to properly evaluate his residual functional

capacity.  In particular, Plaintiff takes issue with the following statement made by the ALJ in

reference to the residual functional capacity: "In sum, the above residual functional capacity

assessment is supported by evidence of symptom amplification, [Plaintiff's] near normal

activities of daily living and his apparent ability to engage in carpentry."[176]  Plaintiff argues that

there is no evidence in the record to support these statements.

        The Court finds that there is evidence to support each of these statements.  Turning first

to symptom amplification, Dr. Dall specifically stated that there were some inconsistencies that

suggested possible symptom amplification.[177]  Dr. Dall also made clear that while there was no

good explanation for Plaintiff's right leg pain, "[t]his doesn't mean that I don't feel he has right

leg pain."[178]  While it is true that no other care providers mention symptom amplification, there is

at least some evidence to support this conclusion by the ALJ.

---

[176]*Id*. at 18.

[177]*Id*. 208.

[178]*Id*. at 216.

Next, as set forth above, the record is full of citations from which the ALJ could reasonably find that Plaintiff engaged in near normal activities of daily living.[179]

Finally, the ALJ's statement concerning Plaintiff's apparent ability to engage in carpentry work is presumably based on Plaintiff's statement to Dr. Anden that he was beginning a new business with his brother  remodeling/rehabilitating houses.[180]  Plaintiff rightfully argues that this statement does not necessarily mean that Plaintiff would be engaging in carpentry work. However, this statement, combined with the other evidence of Plaintiff's activities of daily living supports the ALJ's residual functional capacity assessment.

## IV.  CONCLUSION

Having made a thorough review of the entire record, the Court finds that the ALJ's evaluation and ruling is supported by substantial evidence.  Therefore, the Commissioner's findings must be affirmed.  Further, the Court finds that the ALJ applied the correct legal standard in determining that Plaintiff did not have a disability.

For the reasons just stated, the Court hereby AFFIRMS the decision below.  The hearing set for January 28, 2010, is STRICKEN.  The Clerk of the Court is directed to close this case forthwith.

---

[179]*See id*. at 86 (noting that Plaintiff can do all his self-care and hygiene needs, prepares meals, does laundry, drives a car, uses public transportation, shops in stores for food, watches television, walks around the block); *id*. at 156-64 (stating that Plaintiff watches television, visits neighbors, prepares own meals, cleans his trailer, does laundry, can drive a car, shops for clothes, food, and medication, and goes to medical appointments); *id*. at 166 (stating that Plaintiff is able to tend to his own personal care); *id*. at 201 (noting that he helps brother load vending machines); *id*. at 228 (indicating that Plaintiff went hiking); *id*. at 241 (stating that Plaintiff was going into a new business with his brother remodeling/rehabilitating houses).

[180]*Id*. at 241.

DATED   January 5, 2010.

BY THE COURT:

_____
TED STEWART
United States District Judge